Midland Underwriters, Inc., Appellant, v. Travelers Casualty Insurance Company, Appellee.

Gen. No. 41,475.

Opinion filed January 22, 1941.

LEON N. MILLER and SIDNEY J. SPARBERG, both of Chicago, for appellant.

MEYER A. GINSBURG, of Chicago, for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

On February 17, 1940, plaintiff filed a complaint in chancery in the superior court of Cook county against the Travelers Casualty Insurance Company and prayed for an accounting and for other relief. A motion to dismiss the complaint was sustained and plaintiff was given leave to file an amended complaint. On April 5, 1940, plaintiff filed its amended and supplemental complaint praying for discovery, an accounting, an injunction and for other relief. Defendant filed its motion to dismiss the amended and supplemental complaint. Plaintiff was then permitted to amend its amended and supplemental complaint on the face thereof. The chancellor sustained defendant's motion and dismissed the amended and supplemental complaint as amended, for want of equity at plaintiff's costs. This appeal followed.

* See Callaghan's Illinois Digest, same topic and section number.

It will be noted that plaintiff was granted leave to file an amended complaint and that it filed an amended and supplemental complaint, which was later amended on its face. In the trial court the defendant did not make any point of the fact that plaintiff included supplemental matter in its amended complaint. In fact, the defendant approved the order whereby plaintiff was permitted to amend its amended and supplemental complaint on the face thereof.

The plaintiff's case is based on three written and sealed contracts dated August 13, 1935, August 10, 1936 and June 16, 1939. Under the first contract defendant appointed plaintiff its exclusive sales agent in this State for a period of 2 years for the selling and distributing of two types of policies. Defendant agreed to pay plaintiff, in addition to the $5 down payment which was to be retained by plaintiff's sales representative, a sum of 25 cents per month out of each $1 per month received by defendant on its "$1.00 per month policy" and $2.50 from each of the first two payments made by the insurer on the "$34.50 policy." On the latter policy the agent of plaintiff was to receive the $12 down payment. Defendant was to make payment to plaintiff on the 5th of each month for all payments received during the preceding month. Defendant agreed to supply plaintiff each month with an itemized statement of the various accounts for which remittance was being made. Defendant agreed that during the term of the contract plaintiff should have the right, through its duly designated accountant, representative or attorney to examine all books, records and documents referring to the business of defendant in the policies covered by the contract, upon reasonable notice by plaintiff to defendant and at reasonable times, for the purpose of ascertaining the correctness of the accounts between the parties. Defendant also agreed not to sell or to supply to any other corporation in this State or appoint any other agent to sell in this State the policies

covered by the contract, excepting that the defendant "may sell the said policies to any person or persons soliciting the same from them either through the mails or by personal solicitation at the home office of Travelers, and agrees that all policies mentioned sold by Travelers in the State of Illinois, after the day of within agreement (excepting the exception herein contained) shall be credited to the account of Midland." The parties also agreed that all reinstatement fees collected by defendant on policies sold by plaintiff should be the sole property of defendant and that plaintiff should be entitled to receive payment on the monthly payments thereafter made; that any refunds and sums expended by defendant for licensing of agents should be deducted by defendant from the amounts due to plaintiff and that all refunds made by defendant to policyholders, sold by plaintiff or its agents, should be charged to the account of plaintiff and deducted therefrom, provided such refunds could be made only for reasonable cause and upon notice to plaintiff. The second contract of August 10, 1936, extended plaintiff's exclusive agency to August 10, 1941. This agreement made plaintiff defendant's agent for the sale of three types of policies instead of two. In this second agreement defendant agreed to pay plaintiff 25 cents of each $1 per month received by defendant on the $1 per month policy. This was the same provision as in the first contract. As to the policy known as the $34.50 policy, the second agreement obligated defendant to pay plaintiff, after the payment of the $12 down payment which was to be retained by the sales representative of plaintiff, 25 per cent from each payment thereafter made to defendant on such policy. On the policy referred to as the $32 policy, plaintiff's sales representative was to retain the down payment of $10, and defendant was to pay plaintiff in addition thereto 25 per cent of each payment thereafter made to defendant on such policy. Defendant was to make the payments

on the 9th day of each month, instead of the 5th as in the first contract. The second contract provided that with each payment defendant should supply plaintiff "with a report for which remittance is being made." Defendant was given an option at the end of any one year period to cancel the exclusive sales agency of plaintiff upon 60 days' notice to plaintiff, providing that during the preceding year plaintiff failed to secure 3,000 applications or more for defendant. On such cancellation of the exclusive sales agency, defendant was given the right to designate such agents as it might choose. The cancellation was not to affect payments thereafter made from business previously placed by plaintiff. This second contract provided that "with the signing of this contract, the original contract between the parties hereto will be null and void and of no consequence and such original contract shall be replaced in its entirety by this instrument." Other provisions of the contract of 1936 are in the same language as the original contract. The contract of June 16, 1939 altered the preceding contracts in the following respects: Defendant agreed to pay to plaintiff the sum of $1,608.93 and to deliver to plaintiff in addition thereto a judgment note in the sum of $800 payable 30 days after date without interest; defendant agreed that it would submit to plaintiff a statement of account as of May 31, 1939, and that in the event its books and records revealed that it was indebted to plaintiff as of May 31, 1939, in a sum in excess of $2,408.93, it would immediately pay to plaintiff the sum so found to be in excess of $2,408.93; that plaintiff agreed that in the event an audit revealed defendant was indebted to plaintiff in an amount less than $2,408.93, plaintiff would immediately pay to defendant the amount so found to be due. In the third agreement plaintiff relinquished its right to be the exclusive agent in Illinois as provided by the other two contracts; plaintiff was released of the obligation of sub-

mitting a definite number of applications annually and maintaining an agency force; from and after June 1, 1939 plaintiff was required to submit to defendant only such applications as it deemed advisable and that if such applications were accepted by defendant plaintiff was to receive the entire policy fee and the current month's premium, and 25 per cent of the subsequent premium as collected and resceived by defendant; and the parties agreed that the payment of commissions due plaintiff for the preceding month was to be made on the 12th day of each month, or the day following when the 12th fell on a Sunday or a legal holiday; and plaintiff agreed that it would take 20 per cent off of its commissions providing defendant made such payment by the 12th day of each month. This third agreement defined a paragraph of the original agreement with reference to refunds as meaning refunds of premiums made to policyholders within the first policy year, and that such paragraph was not to apply to a settlement of a policy subsequent to the first policy year.

Plaintiff insists that the allegations in the amended and supplemental complaint as amended, which defendant's motion admits to be true, are sufficient to give a court of equity jurisdiction to grant an accounting, and point out that where the accounts are so complicated that it would be difficult to present the various items to a jury in such a manner as to enable the jurors satisfactorily to determine the amount due, it is definitely settled that the case is one proper for a court of equity. Defendant replies that the allegations are not sufficient to give a court of equity jurisdiction to grant an accounting. Defendant asserts that plaintiff has a full and adequate remedy at law, and that the accounts are not so involved and complicated that it would be difficult to present the various items to a jury in such a manner as to enable the jurors to satisfactorily determine the amount due, and maintains that plaintiff does not present any case for equitable relief. It will

be observed that the parties are in agreement that where the accounts are so involved and complicated that it would be difficult to present the various items to a jury in such a manner as to enable the jurors to satisfactorily determine the amount due, that equity has jurisdiction. We have carefully read the amended and supplemental complaint, as amended, to determine whether the accounts involved are so complicated that the interposition of a court of equity is necessary. Between August 13, 1935 and February 12, 1940, plaintiff submitted to defendant a total of 36,855 applications and defendant issued that many policies pursuant thereto. 8,511 policies were issued prior to August 10, 1936, when the second contract went into effect. During the period between August 10, 1936 and February 12, 1940, at which time defendant refused to accept any further applications, defendant issued at least 28,344 policies pursuant to applications submitted by plaintiff. Defendant submitted a report each month, except for September and November, 1937. On January 15, 1940, defendant paid plaintiff the sum of $1,351.38. This was the last payment made by defendant. It was not accompanied by a statement. Presumably, this last payment was for commissions allocable to plaintiff for December, 1939. Plaintiff alleges that the total accruals to plaintiff up to January 1, 1940, in accordance with the figures of defendant, amount to $73,371.18. Plaintiff states that the total amount collected by defendant, as estimated from the figures submitted by defendant, was $300,000. Plaintiff attached a copy of a monthly report as an example of the type of reports submitted by defendant. The report does not show what the total premium collections were, the division of the premiums collected from the different classes for the month under consideration, how many policies of different classifications were outstanding and in effect from time to time, or which policies terminated or lapsed, or were renewed or reinstated; that no attempt was made to break down

the lump sum figures in the form of a detailed statement; that in the statements plaintiff is debited for such items as "Refunds," "N. S. F. checks," "Premium paid to agent," "Commission deducted from advance payments returned to policy holders," "Refunds applied on policies," "Checks cashed," and that no details are furnished as to the nature of these transactions; that no information is supplied as to the identity or location of persons to whom refunds were made, and that no date is supplied to indicate whether the policyholders to whom refunds were made became such through the efforts of plaintiff, or were the product of solicitation by mail or in person at the home office of the defendant; and plaintiff calls attention to the provision of the contract that such items shall not be charged to the account of plaintiff except upon reasonable cause and upon notice to plaintiff; that contrary to these provisions the defendant made refunds to policyholders after the contestable period under the policies had expired, and that defendant wrongfully debited plaintiff with the refunds so made; that in 1935 such wrongful charge backs amounted to $383.35; in 1936, $718.50; in 1937, $987.32; in 1938, $1,058.64 and in 1939, $1,335.58. Plaintiff further charges that during the four and one-half years prior to the filing of the complaint there were approximately 40,000 distinct transactions between the parties, and that these figures do not include the transactions between the defendant and third persons, and that if the defendant received only 12 payments from each of the policyholders the books of defendant must show over 300,000 entries; that the payment of $1,351.38 on January 15, 1940, by defendant purportedly represents the net accruals to plaintiff for the month of December, 1939, as calculated by the defendant; that plaintiff estimates defendant has collected during the month of December, 1939, as premiums on policies issued at the instance of plaintiff, or on which it is entitled to credit,

a sum in excess of $6,500, and that plaintiff estimates that at the time of the filing of the amended and supplemental complaint there were in full force and effect from 6,000 to 10,000 policies issued by the defendant on applications submitted to it by plaintiff; that to determine which of the policies lapsed or matured, or were canceled or reinstated, necessitates not only the tracing of the history of each policy issued by the defendant in which plaintiff has or had an interest, and the identity of the respective insured, but an investigation, as well, of the thousands of entries as to premiums paid thereon from time to time, the records of lapsation, renewal or reinstatement, the date relative to maturity, payment or refunds and claims and the like. Plaintiff also asks for an accounting as to policies of insurance sold by defendant from August 13, 1935, until May 31, 1939, to persons other than those soliciting the same personally at its office or through the mails. Defendant calls our attention to the fact that under the contracts plaintiff had the right to examine the books and records and to have an audit made, and that plaintiff does not allege that it availed itself of such right. In reply plaintiff calls our attention to the allegation that in February, 1940, it demanded that defendant comply with the contracts and that defendant submit to plaintiff full and detailed monthly accountings of all transactions in which the plaintiff had an interest, together with a statement showing the amount of commissions due and payable to plaintiff, and that defendant failed, neglected and refused to render a full, accurate and complete account; furthermore, that the amended complaint, by way of supplement, avers that on March 6, 1940, pursuant to a subpoena, L. A. Napier, president of the defendant corporation, appeared before a notary public; that plaintiff, by its attorneys, commenced to take his deposition; that he was interrogated with respect to the transactions had by and between the parties; that

he was asked what books or records the defendant then had pertaining to the transactions between the parties and whether the defendant had any journals, ledger or ledger pages or ledger records with respect to such transactions, and that the witness refused to give answer; that he was asked to identify the purported monthly reports, which he refused to do; that he was asked if he had any records of payment made by the defendant to plaintiff since August 10, 1936, and whether he had any record of premiums received by the defendant since August 10, 1936, on policies placed through the medium of applications submitted by plaintiff; that witness refused to answer such interrogatories, and plaintiff avers that by virtue of the premises it would be unavailing to attempt to obtain a true, accurate, full and complete accounting of the transactions had by and between the parties by a mere examination and audit of the records, unless such accounting was had under the supervision of this court, and that a mere examination of the books of account and records in possession or under control of defendant would not be productive of a full, true and complete discovery without explanation from the persons keeping such books of account and record as to the meaning of certain entries or the location of records pertaining to other entries, and that plaintiff is fearful that unless the officers and employees of defendant are placed under oath and required to testify, plaintiff will not secure the benefit of all the books, records and paper writings containing entries relative to the issues involved and will thus be deprived of the discovery sought.

Assuming that the allegations of the amended and supplemental complaint are true, which we are required to do, we are convinced that plaintiff made out a case for equitable intervention. In our opinion the accounts are so involved and complicated that it would be difficult to present the various items to a jury in

such a manner so as to enable the jurors to satisfactorily determine the amount due. In this situation equity takes jurisdiction. While the amended and supplemental complaint does not show that the plaintiff availed itself of the opportunity given it by the contract of inspecting the books and records and having an audit made, it does charge that the president of the defendant declined to answer questions which sought to elicit this information. Plaintiff argues that because of this nonco-operative attitude it would be useless to endeavor to procure an accounting without the aid of the court. Defendant's theory of the case is that "the amended and supplemental complaint, as amended, discloses a purely legal claim for commissions for the recovery of which plaintiff has a full, complete and adequate remedy at law; that in order to qualify the case for equity jurisdiction, the complaint must by well pleaded allegations show either fraud, trust relationship between the parties, need for discovery obtainable only in equity, that the account is so intricate, complicated and involved that it would be impossible for a court of law and a jury to pass upon the issues by reason of the complexity of the situation or some other equitable ground; that it does not disclose any of these grounds; that, under these rules, it is largely in the discretion of the Chancellor to grant or reject equitable jurisdiction in a given case and that here the two Chancellors who, after exhaustive argument, refused such jurisdiction by dismissing the original and amended complaints, cannot be said to have abused such discretion in so doing; that in such cases it becomes necessary to indulge in every intendment in favor of the party seeking to have his cause of action heard at law, rather than to divest him of that right, and that, in this instance, the action of both chancellors was not prejudicial to the plaintiff." We have held that the complaint is cognizable in a court of equity be

cause on its face it shows that the account is so complicated and involved that it would be difficult to present the various items to a jury in such a manner so as to enable the jurors to satisfactorily determine the amount due. It is, therefore, unnecessary to discuss the other grounds for equitable jurisdiction advanced by plaintiff. We do not understand, however, why, in view of the admission by the defendant, that the amended and supplemental complaint discloses a legal claim for commissions for the recovery of which plaintiff has an adequate remedy at law, the plaintiff did not suggest to the court that the cause be redocketed as a law case. The defendant did not demand a jury trial. The principal discussion before us revolves around the question as to whether the accounts were so involved and complicated that it would be difficult to present the various items to a jury in such a manner so as to enable the jurors to satisfactorily determine the amount due. The Civil Practice Act provides that there shall be no distinction respecting the manner of pleadings between actions at law and suits in equity, and that all pleadings shall contain a plain and concise statement of the pleader's cause of action; that legal and equitable issues may be tried together where no jury is employed, and that any cause of action may be transferred at any time from the law docket to the equity docket or vice versa. At the time defendant filed its appearance, it knew that plaintiff was endeavoring to invoke equity jurisdiction, and also probably knew that it would challenge the right of plaintiff to maintain an action in equity, and knew that if the court sustained defendant, the court would have the right to transfer the cause to the law docket. If the chancellor agreed with the position of defendant, then at the suggestion of plaintiff the case could proceed as a law case and the executive committee would designate a judge to hear it. Under the liberal provisions of the Civil Practice Act and the rules of the Supreme

Court concerning discovery; whether at law or in chancery, plaintiff would have a right to his day in court. The practical effect of the order dismissing the amended and supplemental complaint is to force the plaintiff to file an action at law, setting up practically the same allegations as it did in the instant action. The plaintiff then, because it marked its complaint as a "complaint in chancery" instead of a "complaint in law," is turned away without being heard. It was to avoid situations such as this that modern practice and procedure has been liberalized.

For the reasons stated the decree of the superior court of Cook county is reversed and the cause remanded with directions to proceed in a manner not inconsistent with this opinion.

*Reversed and remanded with directions.*

HEBEL, P.J., and DENIS E. SULLIVAN, J., concur.